IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| PASS-A-GRILLE BEACH COMMUNITY CHURCH, INC. a Florida not for profit corporation, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 20-cv- ) |
| CITY OF ST. PETE BEACH, a Florida municipal corporation, | ) ) ) ) |
| Defendant, | ) |

PLAINTIFF'S VERIFIED COMPLAINT
DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF SOUGHT
AND DEMAND FOR JURY TRIAL

Plaintiff, Pass-A-Grille Beach Community Church, Inc. ("the Church"), by its undersigned attorneys, files this complaint against Defendant City of St. Pete Beach, ("the City") and alleges that:

### Parties & Property at Issue

1.      The Church has been organized as a Florida not for profit corporation since 1959 and has been in existence as a faith community for over 100 years. Exhibit A, Decl. of Associate Minister Jeanne Haemmelmann, at ¶ 3.

2.      The Church is located at 107 16th Ave. St. Pete Beach, Fl 33706 ("the Property"). Id. at ¶ 4.

3.      The Church has owned the Property, including the parking lot at issue in this case, since 1957. Id. at ¶ 5.

4.      The Property is in the jurisdiction of Defendant St. Pete Beach, a municipal corporation located within Pinellas County, Florida, and subject to the City's Land Use Development Code (the "Code"). Id. at ¶ 6.

### Nature of the Case

5.      Since 1957, and in furtherance of its sincerely held religious beliefs and to promote its religious mission, the Church allows the general public to park in its parking lot. Id. at ¶ 7. The free parking attracts people to the Church and affords the Church a unique opportunity to serve the community, speak to people who may not otherwise come to the Church about the Church's religious beliefs and activities, and solicit donations which the Church uses to support its religious, not-for-profit activities. Id.

6.      Since 2016, elected and appointed City officials and a few of the Church's neighbors have sought repeatedly to prohibit the Church's religious use of its parking lot. Id. at ¶ 8.

7.      Now the City, pursuant to a final order of the City's Special Magistrate for Code Enforcement entered on August 11, 2020, is prohibiting the Church from allowing anyone is who is not a "customer" or "patron" of the Church to park on the lot, mandating that the Church's off-street parking be "dedicated exclusively for [the Church's] patrons and customers in connection with their use of the church for legitimate church purposes." Exhibit B, August 11, 20202 Order.

8.      The Magistrate's Order further holds that "[a] person who initially is a patron of the [Church] for legitimate church purposes ceases to be a patron once that person leaves the parking lot to do something not connected with the purposes of the church. Moreover, a person who simply parks and leaves the Property, regardless of whether the person pays to park, is never a patron." Id.

9.      As a result of the Magistrate's Order and the City's enforcement, the Church has already been subject to two $500 fines and will be subject to additional $500 fines for each additional violation. Id.

10.     This suit, which seeks damages as well as declaratory and injunctive relief, challenges the manner in which the City has implemented and imposed its land use regulations to restrict the Church's religious land use and its rights guaranteed by the Religious Land Use and Institutionalized Persons Act

("RLUIPA") 42 U.S.C. § 2000cc et seq. the United States Constitution, and Florida law.

### Jurisdiction, Request for Advancement on the Court's Calendar, and Venue

11.    This Court has original subject matter jurisdiction over this case under:

a.  42 U.S.C. § 2000cc-2(f) and 28 U.S.C. § 1331, as this action arises under the United States Constitution and laws of the United States;

b.  28 U.S.C. § 1343(a)(3), as this case is brought to redress deprivations under color of state law, of rights, privileges and immunities secured by the United States Constitution;

c.  28 U.S.C. § 1343(a)(4), as this case seeks to recover equitable relief under acts of Congress, specifically 42 USC § 1983 and 42 U.S.C. § 2000cc, which provide causes of actions for the protection of civil and constitutional rights and injunctive remedies;

d.  28 U.S.C. § 2201(a), as this case seeks declaratory relief under 28 U.S.C. § 2202;

e.  42 U.S.C. § 1988, to secure reasonable attorney fees as part of the case;

f.  supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims which are part of the same case or controversy.

12.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because the Defendant is situated in this district and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rising to the claims occurred in this district.

13.    The Church also respectfully requests a speedy decision and advancement on this Court's calendar under Fed. R. Civ. P. 57 and 28 U.S.C. § 2201.

### The Church's Religious Land Use

14.    The Church is committed to preaching the gospel of Jesus Christ and eliminating those barriers that separate people from each other and God. Exhibit A, Decl. of Associate Minister Jeanne Haemmelmann, at ¶ 9.

15.    A vital aspect of the Church's beliefs and ministry is outreach to the local community and to the world. This is a direct command from Christ himself: "Therefore go and make disciples of all nations, baptizing them in the name of

the Father and of the Son and of the Holy Spirit, and teaching them to obey everything I have commanded you." Matthew 28:19-20a (NIV). Id.

16.     To this end, the Church does three things which are at issue in this case: (1) the Church freely opens its parking lot to the general public; (2) communicates its religious mission and values to those who park in the lot through verbal evangelism and the distribution of Christian literature; and (3) solicits charitable donations for its youth and missions ministry from the members of the public that park in the lot. Id.

17.     Since the Church is located roughly a block from the beach, members of the general public have used the Church's lot for beach parking for over sixty years. Exhibit A, Decl. of Associate Minister Jeanne Hammerman, at ¶ 12.

18.     The Church has always offered free parking to members of the general public. The Church requested payment on weekends for a short time during the summers of 2013 through 2015, but the lot was open and free for the vast majority of time even during that time period. Id.

19.     The Church's parking lot is adjacent to and surrounds the Church building itself. Exhibit C, Aerial Photograph. The Church has approximately

one hundred (100) spots on its parking lot. Exhibit A, Decl. of Associate Minister

Jeanne Haemmelmann, at ¶ 14.

20.    The Church desires to attract people to the Church so that they can

learn about, join in, and support the Church's ministries. Id.



21.    The Church's free parking is one of the most effective ways the

Church can use the property God has given it to serve the community and attract

new people to the church. Id.

22.    The Church sincerely believes that God has called it to use its

parking lot in this manner. Id.

23.    The Church has allowed the general public to use its parking lot

since 1957 and walk to the public beach. Id.

24.     The City has had public meetings in the vicinity and has parked their vehicles on the Church lot and encouraged others who attended the meetings to park on the lot. Id.

25.     In 2016, the Church installed a donation box, similar to an "alms box," on the lot requesting a donation which was used by the youth group for its youth ministry.



26.     In addition, members of the youth group were at times on the lot, handing out tracts explaining the basic tenants of Christianity and information regarding the youth group. Id.

27.    Consistent with the Church's religious beliefs, the Church building itself and the surrounding parking have always been open and inviting to the general public with the goal of showing love and bringing new converts to Christ. See, e.g. Hebrews 13:2; Romans 12:13; 1 Peter 4:9. Exhibit A, Decl. of Associate Minister Jeanne Haemmelmann, at ¶ 22.

28.    Since the 1950s the Church has allowed its parking lot to be used by many others, including the neighbors, their guests, construction crews, the general public, and for civic events. Id.

29.    On days when the weather is good, the Church's lot is often full due to beachgoers appreciative of the Church's offer of free parking. This has been the case for many years regardless of the Church's activity on the lot. Exhibit A, Decl. of Associate Minister Jeanne Haemmelmann, at ¶ 24.

30.    Anyone that enters onto the Church Property is someone in need of God's love, and therefore akin to what a secular business would call a "customer" or a "patron." Id.

31.    The Church is not a commercial business but rather offers the public the gift of a free place to park and the opportunity to support the Church. Members of the public are free to donate, or not donate, to the youth group when parking on the lot. Id.

**The City's Various Efforts to Shut the Church's Religious Land Use Down**

32. In June 2016, and in response to the Church youth group evangelizing and soliciting donations from the general public who used the Church's lot for parking, the City cited the Church for allegedly violating Sections 17.2 – 17.4 of its parking code. Exhibit D.

33. Sections 17.2 – 17.4, enacted in 2006, regulate uses in the Institutional ("INS") zoning district, which is the district wherein the Church Property is located. Exhibit D, Code Sections 17.2-17.4

34. The City argued the Church was violating Section 17.4 by operating a "commercial parking lot" on the Property, which is a prohibited use in the INS district. Exhibit E, June 2016 Notice of Violation.

35. The City's Special Magistrate for Code Enforcement held a hearing on the notice of violation on July 11, 2016. The Magistrate concluded that while a "paid parking" model was a violation of the Code, soliciting donations and evangelizing to those who parked in the lot was not a violation. Exhibit F, 7/11/16 Findings; Exhibit G, 7/11/16 Transcript, p. 15-17.

36. The City never appealed the Magistrate's July 11, 2016 order.

37. On September 15, 2016, the Church was notified that it was to appear before the Special Magistrate for another hearing for "second violation"

of Sections 17.2 – 17.4. Exhibit H, 9/15/16 Notice of Violation. The second hearing took place on October 10, 2016.

38.     At the October 2016 hearing, it was argued that the Church was in violation of the prohibition on paid parking because one afternoon the youth group used a sign referring to a "fundraiser." See Exhibit I, Transcript of October 10, 2016 hearing at p. 3.

39.     The Magistrate again discussed the differences between "paid parking" and soliciting voluntary donations.

> So this is what I'm going to do: I think that we all understand a donation is different from a charge. If you are accepting donations, then I'm not going to tell you that you cannot accept donations. Exhibit I, Transcript of October 10, 2016 hearing at p. 3.

40.     The Magistrate further clarified that the only violation on the property was the "fundraiser" sign, and that all other parking and soliciting activities were legal under the Code.

> I do not think that at this point that accepting donations rises to the level of a commercial parking space as long as they are on the property, you don't say "fundraiser."

> I do think that this -this sign is in violation, so I am going to hold the property in violation. But again, you have an opportunity to abate that, and I'll give you five days to abate that. And made sure that it doesn't happen anymore. You need to make sure your signs are in - are in off the property.

> And we talked about this at the last hearing: you have to let anybody park there. Id., p. 4.

41.     Later in the hearing, the Magistrate further confirmed that the Church was within its rights to allow members of the public to park in its lot.

> As long as you are only accepting donations, parking is free, it's your property and you may allow people to park on that property. You cannot say "fundraiser," you cannot do -- any indication that a payment is required to park on the property is a violation. Id., at p. 6 (emphasis added).

42.     Accordingly, the Magistrate's order following the October 10, 2016 hearing reflected that any violations had been cured, and the Property was in compliance so long as donations remained voluntary. Exhibit J, October 10, 2016 Order.

43.     The City never appealed the Magistrate's October 10, 2016 order.

**City Commissioner Pletcher Conspires with Code Enforcement and an adjacent property owner to deny the Church's Religious Land Use**

44.     Following the October 10, 2016 hearing, City officials continued to target the Church and its youth group for harassment and conspired with neighbors regarding how to "shut down" the Church's activity. Exhibit K, Emails Ex. A, Declaration.

45.     Through a public records request, the Church learned of a July 10, 2017 email sent to City Commissioner Melinda Pletcher by Mr. Neal Blackburn (an unhappy neighbor who opposes the Church youth group's activities). Exhibit K.

*Melinda Pletcher*
REALTOR®

Tampa  St. Petersburg  Clearwater
Office 727.342.3800   Cell 727.455.6633 · Web www.smithandassociates.com

<image001.png>  <image002.png>  <image003.png>  <image004.png>  <image005.png>

**From:** Neal Blackburn <neal.h.blackburn@gmail.com>
**Sent:** Monday, July 10, 2017 3:23 PM
**To:** Melinda Pletcher
**Subject:** Beach parking at the church

Hi Melinda,

I hope all is going great with you.  The church continues on with beach parking. I met this morning with Jennifer and Peyt. Several neighbors asked that I let them know how it went, so this is my message to them today.  Please let me know if you have any ideas on how to move forward with this topic.  Thanks as always...

My 45 min. meeting this morning with Jennifer and Peyt went very well. The City people (Melinda, Jennifer, Peyt and Andrew Dickman), are, and have always been great, sympathetic and helpful. What we're up against is the Church's right to ask for donations on their property (first amendment stuff).
The City Magistrate ruled six months ago that the Church can ask for donations from people that park on their property. They can put up signs only on their property saying "donations" but they must also allow people to park there without paying.
My focus is on these two issues. How do we get the church back in front of the City Magistrate and what are the arguments that will convince her to shut them down.
Peyt is going to drive down every Saturday afternoon to take pictures of his own. He can't use other peoples pictures. He plans on siting them for either signs that are off of their property or for to many cars parked at the church. Jennifer is going to talk with Andrew Dickman, the City attorney, to help us decide what arguments to make at the hearing. Clearly this is a commercial parking lot on Saturdays and Sundays and all Holidays, no matter what the church calls it and our current city ordinances do prohibit that.
I'll keep you up on any developments. We're hoping for an August 14th hearing.

All the best,
Neal

46.     The July 10, 2017 email details meetings and efforts involving Mr. Blackburn and several City representatives. The email acknowledges that the Special Magistrate had already ruled that the Church could "ask for donations from people that park on their property," and Mr. Blackburn acknowledged that the City's and his combined efforts were aimed at getting the Special Master to "shut ... down" the Church youth group's activity. Exhibit K.

47.     Perhaps most disturbingly, the email reflects how, during the July 2017 meeting, the City's Code Enforcement Division Manager, Mr. Peyt Dewar, agreed to conduct regular, weekly surveillance of the Church youth group's activities until he found a "violation." Id.

48.     By Spring 2018, and consistent with the plan discussed in the above referenced July 17, 2017 email, the Church learned that the City's Code Enforcement Division's Manager was conducting "surveillance" of the youth group's parking activities. Exhibit A, Decl. of Associate Minister Jeanne Haemmelmann, at ¶ 28.

49.     Mr. Dewar's heavy-handed "surveillance" upset the teenage volunteers, and he also acted confrontationally towards adult Church members. Exhibit A.

50.     In Spring and Summer of 2018, the Church learned of two additional "Notices of Violation" the City had prepared. The third notice was never served on the Church; and the fourth notice was served, but no hearing was held. Exhibit A, Decl. of Associate Minister Jeanne Haemmelmann, at ¶ 30.

51.     From 2018 to March 2019, the City renewed its heavy-handed surveillance of the Church's youth group activities, leading to the City receiving more complaints. Exhibit L, Emails.

52.    In May 2020, Commissioner Melinda Pletcher again caused these matters to re-surface when she disparaged the Church via social media and received feedback from a Church member. Around that time, Commissioner Pletcher renewed the City's focus on the Church by sending to the Code Enforcement Division pictures showing that the Church's lot was filled one weekend. What she apparently did not know is the Church's youth group had no involvement with parking during that weekend. Exhibit M, Pletcher Email to Code Enforcement.

### The Current Effort to Restrict the Church's Religious Land Use

53.    On June 16, 2020, the City issued a Notice announcing that the City was charging the Church with a "Repeat Violation" of the City's Code Sections 17.2 – 17.4. Exhibit N, Notice of Repeat Violation.

54.    The hearing regarding the "Repeat Violation" was held on July 16, 2020. Exhibit O, Transcript of July 16, 2020 Hearing.

55.    Following the July 16, 2020 hearing, the argument for the first time was raised that the Church was in violation of Code Section 23.4(j), which reads in relevant part: "Off-street parking spaces shall be reserved for the exclusive use of residents, customers, patrons, or employees of the principal use of the property they are designed and intended to serve…"

56.     This issue was raised despite it being absent from the notice of "Repeat Violation" and the Church having never received any other prior notice. Exhibit O, Notice of Repeat Violation; Exhibit A, Decl. of Associate Minister Jeanne Haemmelmann, at ¶ 32.

57.     The City also continued to argue that the Church's solicitation of charitable donations and its practice of allowing the general public to use its lot were violations of Sections 17.2-17.4 and constituted a "commercial and/or off-premises" lot.

58.     The Special Magistrate issued an order on July 24, 2020 which correctly found that since the Church was asking for donations rather than charging a fee for parking, so the Church was not a "repeat violator." Exhibit P, July 24, 2020 Order.

59.     The City objected to their Magistrate's Order, filing a Motion for Reconsideration demanding sua sponte that an amended Order enter closing down a significant portion of the Church's ministry. Exhibit Q, Motion for Reconsideration (filed without Exhibits).

60.     However, in an Amended order dated August 11, 2020, the Magistrate concluded that as a matter of law Respondent's off-street parking must be "dedicated exclusively for Respondent's patrons and customers in connection

with their use of the church for legitimate church purposes." And that "[a] person who initially is a patron of the Respondent for legitimate church purposes ceases to be a patron once that person leaves the parking lot to do something not connected with the purposes of the church." Exhibit B, August 11, 2020 Order.

61.     In addition, the Magistrate concluded that "a person who simply parks and leaves the Property, regardless of whether the person pays to park, is never a patron." Id.

62.     Because the Church had admitted it allows members of the public to park in its parking lot and walk off-premise, the Magistrate held that the Church's use was prohibited under Section 17.4, pursuant to Land Development Code Section 23.4(j).

63.     The Church disagrees with this interpretation of the Code and contends that anyone who comes to the Church to receive the Church's offer of free parking is a "patron" of the Church. Free parking is a charitable service the Church offers members of the public so that they will come to the Church, hear about the Gospel, and have an opportunity to support the Church's religious mission.

64.     Further, the City admitted at the hearing that Section 23.4(j) has never been interpreted in this manner against any other assembly, institution, or businesses other than the Church. Exhibit A. Declaration.

65.     Because there was no evidence that the Church was seeking a fee to park by an hourly or monthly contract, which is an element of the definition of a commercial parking lot, the Magistrate rejected the City's claim that the Church was operating a commercial parking lot. Id., p. 4.

66.     Because the parking lots are located on the same property as the church, which is the principal use of the Property, the Magistrate also rejected the City's claim that the Church was operating an off-premise parking lot. Id.

67.     Ultimately, the Magistrate issued a final order finding the Church in violation fining the Church $500 for two violations (a total of $1,000) plus court costs incurred by the City. Id.

68.     The City had never enforced Section 23.4(j) with Section 17.4 in the manner it has in this case against any other property owner in the City. The City admitted as much in the July 16, 2020 hearing. Exhibit A.

69.     There are numerous other parking lots used by non-customers and non-patrons of the associated businesses and institutions, but those lots/entities have not been targeted by the City in the way the Church has.  One is the Dolphin

Plaza, located near the Church, which is commercial strip mall with a Publix Grocery Store, a CVS and Chic Fil A and several other stores. The Plaza includes a private parking lot where people park their cars and walk across the street to the public beach.  No enforcement action has been taken against the owners of the Dolphin Plaza. Rather, the City installed cross walks to allow patrons to park at Dolphin Plaza and walk to the public beach. Ex. A; Exhibit R, Photos and Video from Dolphin Plaza Lot.

70.    To date, the Church is now prevented from its historical practice of offering free parking to the general public in accordance with its sincerely held religious beliefs and so that it can share its religious message with them and solicit charitable donations from them.

71.    If the Church fails to comply it will be subject to substantial, daily fines of $500 for each violation.

## COUNT I

### Violation of the Religious Land Use and Institutionalized Persons Act
### Equal Terms As-Applied Claim, 42 U.S.C. § 2000cc(b)(1)

72.    Congress defined "religious exercise" to broadly include:

"any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and specifies that the "use, building, or conversion of real property for the purpose of religious

exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."

42 U.S.C. 2000cc-5(7).

73.     Congress further directed that RLUIPA should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. 2000cc-3(g).

74.     Under RLUIPA's Equal Terms provision, "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

75.     The plaintiff bears the initial burden of "produc[ing] prima facie evidence to support a[n equal terms] claim," and thereafter "the government . . . bear[s] the burden of persuasion on any element of the claim." 42 U.S.C. § 2000cc–2(b).

76.     A claimant must produce prima facie evidence that: (1) the claimant is a religious assembly or institution, (2) subject to a land use regulation that (3) treats the religious assembly or institution on less than equal terms, with (4) a nonreligious assembly or institution. 42 U.S.C. § 2000cc(b)(1)).

77.    The Church is a "religious assembly or institution" under RLUIPA, 42 U.S.C § 2000cc et seq.

78.    The City is a "government" under RLUIPA, 42 U.S.C. § 2000cc-5(4)(A), and is responsible for its ordinances as well as the acts, omissions, and interpretations of its officials, employs, and commissioners.

79.    The Church's use of the Property is subject to the land use and zoning regulations contained in the St. Pete Beach Land Development Code.

80.    The City has treated the Church on less than equal terms with the non-religious assemblies and institutions in regard to the application of Section 23.4(j). In particular individuals park at the Dolphin Plaza, a commercial strip mall, and walk across the street to the public beach. Exhibit R.

81.    Specifically, the City has stated that the Church has violated the Code because "it allows members of the public to park in its parking lot and walk off-premise to do something not connected with the purpose of the church." Exhibit B.

82.    The City has admitted that it had never applied the Code in this manner against any other non-religious assembly or institution. Exhibit A; Exhibit O.

83.     As stated above, many non-religious assemblies and institutions "allow members of the public to park in [their] lot and walk off-premise to do something not connected with the purpose of the [entity]."

84.     The Church must now take affirmative action to somehow close its lots to the general public that other nonreligious assemblies and institutions are not required to take.

85.     This unequal treatment of the Church will result in damage to the Church's mission and will strain the Church's resources by requiring expenditures on measures to effectuate the City's edict. Exhibit A.

86.     The City's unequal treatment of religious and non-religious assemblies and institutions throughout its jurisdiction violates the equal terms provision of RLUIPA.

87.     The City's unequal treatment of the Church is not the least restrictive means of further any compelling government interest.

88.     As a direct result of the City's violations of the Church's rights under 42 USC § 2000cc(b), as alleged above, the Church is suffering irreparable harm for which there is no adequate remedy at law.

89.     Furthermore, as a direct result of the City's violations of the Church's rights under 42 USC § 2000cc(b), as alleged above, the Church has suffered

damages and is entitled to recover equitable relief, damages, costs, and attorney fees.

WHEREFORE the Church is entitled to the relief requested below.

## COUNT II
### Violation of the Right to Equal Protection under the Law Guaranteed by the Fourteenth Amendment to the United States Constitution (42 USC § 1983)

90.     The City's disparate treatment of the Church violates the Church's right to the Equal Protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution. This claim includes but is not limited to a theory of a class-of-one violation.

91.     The Church has been treated differently from other entities owning parking lots in the City.  Specifically, the City has enforced Section 23.4(j) against the Church in a way that it had never enforced Section 23.4(j) against any other entity at all or against similarly situated entities. In particular, the City has taken no enforcement action against the Dolphin Plaza and many other uses adjacent to it.

92.     There is no rational basis for the City's targeting of and unequal treatment of the Church.

93.     The unequal treatment of the Church in this case was intentional as evidenced by the allegations discussed herein, and specifically the surveillance

and harassment of Church members and conspiracy with the neighbors to "shut down" the Church.

94.     This claim also includes a theory of selective enforcement of the City's Code.

95.     The City had not enforced the Code, specifically Section 23.4(j), against any other similarly situated entity despite the fact that many other entities allow the general public to park in their lots regardless of whether the parkers leave the lot at any time for another purpose.

96.     The City has not required any other similarly situated entity to take the preventative actions which will now be required of the Church to exclude the public from its lot.

97.     In particular, the City has not enforced Section 23.4(j) against the Dolphin Plaza parking lot in the same way as it has against the Church.

98.     The City's enforcement of the Code against the Church has been in bad faith and based upon impermissible considerations such as the Church's protected First Amendment activity of soliciting charitable donations and evangelism.

99.     As a direct result of the City's violation of the Church's Fourteenth Amendment rights as described above, the Church has been denied the equal

protection of the law and is suffering irreparable harm for which there is no adequate remedy of law.

100.   As a direct result of the City's violation of the Church's Fourteenth Amendment rights to equal protection of the law, as alleged hereinabove, the Church has suffered and is entitled to recover compensatory and nominal damages, costs and attorney fees.

WHEREFORE, the Church is entitled to the relief requested below.

## COUNT III
### Deprivation of Legal or Legal Nonconforming Use (Florida Law)

101.   As stated above, the Church's use of opening its parking lot to the general public was established as a legal use and is entitled to be treated as no worse than a legal nonconforming use pursuant to St. Pete Beach Land Development Code Sections 3.10(a) and 23.4(n).

102.   Code Sections 23.4(j) and 17.4 were not enacted until 2005 and 2006 while the Church's legal use of its parking lot dates back to the 1950s.

103.   Under Florida law, a legal nonconforming use may only be eliminated by attrition (amortization), abandonment, and acts of God as speedily as is consistent with proper safeguards and the rights of those persons affected.

104.    The parking lot and its use were not destroyed by an act of God. Neither was the lot or use abandoned by the Church.

105.    Further, since the St. Pete Beach Land Development Code does not specific an end date for nonconforming uses, the use was not terminated by attrition.

106.    Therefore, the City's actions in depriving the Church of its legally established use violates Florida law.

107.    As a direct result of the City's deprivation of the Church's legal use of its parking lot, the Church is suffering irreparable harm for which there is no adequate remedy at law.

108.    Furthermore, as a direct result of the City's deprivation of the Church's legal nonconforming use of its parking lot, the Church is entitled to equitable relief, damages, and the recovery of its costs and attorney fees.

**COUNT IV**
**Violation of the Right to Free Speech and Expression Guaranteed by the First Amendment to the United States Constitution (42 USC § 1983)**

109.    As alleged throughout, the Church has been engaged in protected First Amendment conduct. Specifically, the Church solicits charitable donation from members of the public who park on the Church's lot both through in-person solicitation and stationary donation receptacles.

110.    The City's treatment of the Church violates the Church's right to free speech and expression guaranteed by the First Amendment as it precludes the Church from seeking charitable donations via in-person solicitations and through receptacles as alleged herein.

111.    Further, the City's treatment of the Church violates the Church's First Amendment rights to evangelize members of the general public who choose to park on the Church's lot as alleged herein.

112.    The City had no probable cause to continue to prosecute the Church due to, inter alia, the Magistrate's 2016 orders and due to the fact that the Church's use of its lots was, at worst, a legal nonconforming use.

113.    There is no rational basis for the City's actions against the Church.

114.    The City's Code restriction does not represent a reasonable time place and manner restriction and denies the Church the ability to communicate its message and solicit donations from its intended audience.

115.    The City's actions against the Church are not narrowly tailored to any compelling government interest.

116.    Further, as applied by the City, and under the Magistrate's order, Code Section 23.4(j) requires the Church to exclude any person from its parking lot that is not there for "legitimate church purposes." Exhibit B. But neither the

City nor the magistrate have the constitutional authority to dictate to the Church or its guests what is or is not a "legitimate church purpose."

117.   The First Amendment protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."

118.   As a direct result of the City's violation of the Church's First Amendment rights as described above, the Church is suffering irreparable harm for which there is no adequate remedy of law.

119.   As a direct result of the City's violation of the Church's First Amendment rights as alleged hereinabove, the Church has suffered and is entitled to recover compensatory and nominal damages, costs and attorney fees.

## COUNT V
### Violation of the Religious Land Use and Institutionalized Persons Act
### Substantial Burden Claim, 42 U.S.C. § 2000cc(b)(1)

120.   Congress provided in Section 2(a)(1) of RLUIPA statutory protections for "religious exercise" as follows:

> "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . is in furtherance of a compelling government interest [and] is the least restrictive means

of furthering that compelling government interest." U.S.C. 2000cc(a)(1).

121.   The City has made an "individualized assessment" of the Church's land use within the meaning of 42 U.S.C. § 2000cc(a)(2)(C).

122.   The City's imposition of its land use regulations on the Church's use of the Property affects "commerce among the several States" within the meaning of 42 U.S.C. § 2000cc(a)(2)(B).

123.   The City has imposed its land use regulations in a manner which places more than an inconvenience on the Church's religious exercise.

124.   The City has imposed its land use regulations in a manner which places significant pressure on the Church to forego its religious exercise at the Property.

125.   Specifically, the City is using Code Sections 17.2-17.4 and 23.4(j) to ban the Church from (1) allowing the general public to park in its lot as it has done since the 1950s; (2) soliciting charitable donations for its youth and missions ministries from the general public on the lot; and (3) from spreading the gospel of Christ to the general public who parks on the lot.

126.    To be clear, the Church believes God has directed it to continue all three (3) actions described in paragraph 16 as part of its religious mission and religious land use. Exhibit A.

127.    Consistent with its biblical mandate, the Church is an open, inclusive and welcoming place of worship.  It is not a private club, nor is it a gated community. It is a public place of respite, a place of reflection, joy and corporate worship.  To that end, it is open to members and non-member; to celebrate its religious nature and open to the curious who wish to learn, grow and live in faith.

128.    The Church had a reasonable expectation that it could allow the general public to park on its lot because it has been done since the 1950s and is thus a legally established use under Florida law and the City Code.

129.    Because the City's land use regulations have been implemented or imposed in a manner that substantially burdens the Church's religious exercise, the City bears the burden to show that the imposition of the burden furthers a compelling government interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-2(b).

130.    The City has implemented or imposed its land use regulations in a manner which provides the Church no alternative locations within the jurisdiction

wherein it can practice its religious land use in the manner described in paragraph 16.

131.    The manner in which the City has imposed its land use regulations to deny and restrict the Church's use of the Property is not supported by a compelling governmental interest, nor is it the least restrictive means of furthering any compelling governmental interest.

132.    Accordingly, the City has imposed a "substantial burden" on the Church's religious exercise in violation of RLUIPA, 42 USC § 2000cc(a)(1).

133.    According to Code Section 3.10(a),

Nonconforming uses of land, structures and premises which were lawfully established prior to the adoption of this Code, but which are not permitted or are otherwise currently prohibited by this Code, may continue to operate at their present location until such time as such use has been discontinued.

134.    Similarly, Code Section 23.4(n), specifically addressing parking, provides

Notwithstanding any other provisions or restrictions contained in this Code, all parking lots, that have been permitted in accordance with this Code and in place at the time of adoption of this Ordinance, are considered vested until such time as the owner of the lot chooses to expand or change use of the property.

135.   The Code sections raised by the City and Magistrate, Sections 23.4(j) and 17.4, were passed in 2005 and 2006, while the Church has been allowing the general public to park in its lot since the 1950s.

136.   It is undisputed that the Church's practice of allowing the general public to park in its lot was legal when it began in the 1950s.

137.   Moreover, as recently as the 2016 Magistrate hearings, the City's Magistrate had informed the Church and the City that the Church was legally permitted to allow the general public to park in its lots and solicit donations. Exhibit I.

138.   As such, the Church's practice of allowing the general public to park in its lot is a legally established use that the City and the Magistrate cannot divest the Church off by changing its interpretation of the Code.

139.   The City's actions threaten to deprive the Church of its vested rights in its legal use of the parking lot.

140.   Depriving (or even attempting to deprive) a religious institution of a legal or legal nonconforming land use is a substantial burden under RLUIPA. *See World Outreach Conference Ctr. v. City of Chi.*, 591 F.3d 531 (7th Cir. 2009).

141.    The City has implemented and imposed its land use regulations in a manner which has placed substantial pressure on the Church to modify its behavior and violate its religious beliefs.

142.    The City's actions have created considerable expense and uncertainty for the Church in its religious use of the Property. Exhibit A.

143.    The City has imposed its land use regulations in manner which will cause the Church to suffer financial loss. Exhibit A.

144.    Under the City's and Magistrate's current interpretation of the Code, a Church member who parks on the Church lot and attends a Church function, such as a Sunday service, and leaves the lot for any amount of time for any purpose other than Church-related activities subjects the Church to violations and fines.

145.    As a direct result of the City's violation of the Church's rights protected under RLUIPA, 42 USC § 2000cc(a), the Church is suffering irreparable harm for which there is no adequate remedy at law.

146.    Furthermore, as a direct result of the City's violation of the Church's rights under RLUIPA, 42 USC § 2000cc(a) as alleged above, the Church is entitled to equitable relief, damages, and the recovery of its costs and attorney fees.

WHEREFORE the Church is entitled to the relief requested below.

## COUNT VI
## Violation of the Florida Religious Freedom Restoration Act
## (Fla. Stat. § 761.03)

147.   Pursuant to Section 761.03 of Florida's Religious Freedom Restoration Act (RFRA), "[t]he government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, except that government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person: (a) Is in furtherance of a compelling governmental interest; and (b) Is the least restrictive means of furthering that compelling governmental interest." Fla. Stat. § 761.03.

148.   Because the City's land use regulations have been implemented or imposed in a manner that substantially burdens the Church's religious exercise, the City bears the burden to show that the imposition of the burden furthers a compelling government interest and is the least restrictive means of furthering that interest. Fla. Stat. § 761.03.

149.   The manner in which the City has imposed its land use regulations to deny and restrict the Church's use of the Property is not supported by a

compelling governmental interest, nor is it the least restrictive means of furthering any compelling governmental interest.

150.   Accordingly, the City has imposed a "substantial burden" on the Church's religious exercise in violation of Florida's RFRA, codified at Fla. Stat. § 761.03.

151.   As a direct result of the City's violation of the Church's rights protected under Florida's RFRA the Church is suffering irreparable harm for which there is no adequate remedy at law

152.   Furthermore, as a direct result of the City's violation of the Church's rights under Florida's RFRA as alleged above, the Church is entitled to equitable relief, damages, and the recovery of its costs and attorney fees.

WHEREFORE the Church is entitled to the relief requested below.

## COUNT VII
### Violation of Due Process Rights Guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution (42 USC § 1983)

153.   The City's conduct as described herein demonstrates that Section 23.4(j) and the City's alleged enforcement mechanism under Section 17.4 is void for vagueness.

154.   The essential purpose of the "void for vagueness" doctrine is to warn individuals of the consequences of their conduct.

155.   The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.

156.   Section 23.4(j) does not convey what conduct is proscribed by a parking lot owner and thus leaves the door open for arbitrary and discriminatory enforcement as has happened in this case.

157.   There is no guidance as to when a parker ceases to be a "patron" or "customer" such as to give rise to a violation by the parking lot owner.

158.   There is no guidance as to whether a Church member attending a service and then going for a short walk around the neighborhood for recreational purposes ceases to be a "patron" or "customer" such as to give rise to a violation.

159.   There is no guidance as to what preventative measures a parking lot owner must take in order to avoid prosecution under the Code. Must a parking lot owner hire 24/7 security? Must it question what the parker intends to do after parking on the lot? The Code is silent.

160.   There is simply no guidance as to what amounts to a violation and what conduct will prevent or cure the violation.

161.   Such a vague law gives the City unbridled discretion regarding enforcement.

162.   The law is void for vagueness and violates the United States Constitution as described herein.

163.   As a direct result of the City's violation of the Church's due process rights as described above, the Church is suffering irreparable harm for which there is no adequate remedy of law.

164.   As a direct result of the City's violation of the Church's due process rights as alleged hereinabove, the Church has suffered and is entitled to recover compensatory and nominal damages, costs and attorney fees.

WHEREFORE, the Church is entitled to the relief requested below.

## COUNT VIII
### Violation of the Right to Free Exercise of Religion Guaranteed by the First Amendment to the United States Constitution (42 USC § 1983)

165.   The terms of the City's Land Development Code described above, as well as the Magistrate' 8/11/20 Order interpreting the same, both on their face and as applied by the City, substantially burden the Church's free exercise of religion. The Code Sections described herein and the Magistrate's 8/11/20 Order, both on their face and as applied by the City, are not neutral, not generally applicable, and are also a system of individualized assessments.

166.   As the Code and Order and the applications of the Code and Order by the City as described above impose discriminatory burdens on the Church and

religious assemblies in general, while permitting non-religious assemblies to be free of such burdens, the City has unjustifiably violated the Church's right to the free exercise of religion.

167. In particular, the Magistrate's 8/11/20 Order impermissibly restricts Church parking to those who are there for "legitimate church purposes."

168. The City and Magistrate's attempt to restrict the Church's activities to an undefined phrase such as "legitimate church purposes" is a substantial burden on the Church's free exercise of religion.

169. As a direct result of the City's violations of the Church's right to the free exercise of religion, as described above, the Church is suffering irreparable harm for which there is no adequate remedy at law.

170. As a direct result of the City's violation of the Church's First Amendment right to the free exercise of religion, as described above, the Church has suffered and is entitled to recover compensatory and nominal damages, costs and attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, the Church respectfully requests a judgment against Defendant City of St. Pete Beach and that this Honorable Court:

a.    Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order;

b.    Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Church may immediately continue to allow the general public to use its parking lot and may continue to communicate religious messages to and solicitation of charitable donations from those who park in the lot;

c.    Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 64, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-4 preliminarily and permanently enjoin the City from enforcing its land use regulations to prevent the Church from allowing the general public to use its parking lot, soliciting for charitable donations on the lot, and evangelizing those who park in its lot;

d.    Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and 42 U.S.C. § 2000cc-2(a), award the Church all necessary and appropriate relief including compensatory and nominal damages;

Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order;

b.      Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Church may immediately continue to allow the general public to use its parking lot and may continue to communicate religious messages to and solicitation of charitable donations from those who park in the lot;

c.      Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 64, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-4 preliminarily and permanently enjoin the City from enforcing its land use regulations to prevent the Church from allowing the general public to use its parking lot, soliciting for charitable donations on the lot, and evangelizing those who park in its lot;

d.      Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and 42 U.S.C. § 2000cc-2(a), award the Church all necessary and appropriate relief including compensatory and nominal damages;

e.      Declare that the City has violated the Church's rights under the aforementioned provisions of RLUIPA, the First, Fifth, and Fourteenth Amendments of the United States Constitution, and Florida's RFRA;

f.      Declare that the City's prohibition of the Church's use of the

Property is arbitrary and capricious;

g.      Declare that Code Section 23.4(j) is void for vagueness and is

unenforceable against the Church;

h.      Pursuant to 42 USC § 1988, 42 USC § 2000cc-2(d), Fed. R. Civ. Pro.

54(d) and other applicable law, award the Church its reasonable attorney

fees, costs; and

i.      Grant such other and further relief as the Court deems equitable,

just and proper.

## Verification

Pursuant to 28 U.S.C. § 1746 I, Jeanne Haemmelmann, hereby declare under penalty of perjury that the allegations contained in the complaint, as also set forth in my declaration are true, and that I have personal knowledge of the same and can attest to the same at trial.

_Jeanne Haemmelmann_

_____

By:  Jeanne Haemmelmann
Its:  Youth Pastor

Dated: August 20, 2020

## Plaintiff's Jury Demand

Plaintiff demands a trial by jury for all the claims asserted in this case.

By: s/

Daniel P. Dalton (Mi. - P 44056)
Noel W. Sterett (Ill. 6292008)
Lawrence Opalewski (Mi. P 77864)
Dalton & Tomich, PLC
Attorneys for Plaintiff
The Chrysler House
719 Griswold Suite 270
Detroit, MI 48226
Tel. (313) 859-6000
Fax (313) 859-8888
ddalton@daltontomich.com
nsterett@daltontomich.com
lopalewski@daltontomich.com

s/

LEE H. RIGHTMYER, ESQUIRE
FBN 0348945
14020 Roosevelt Blvd., Suite 808
Clearwater, FL 33762
Telephone: (727) 572-4545
Facsimile: (727) 572-4646
Primary Email: lrightmyer@baskineisel.com
Secondary Email: cara@baskineisel.com
Secondary Email: eservice@baskineisel.co

- 42 -